UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| MARK R. BORMES,<br><br>               Plaintiff,<br><br>vs.<br><br>NANCY A. BERRYHILL, ACTING<br>COMMISSIONER OF SOCIAL<br>SECURITY;<br><br>               Defendant. | 4:16-CV-04155-VLD<br><br><br>MEMORANDUM OPINION<br>AND ORDER |

## INTRODUCTION

Plaintiff, Mark R. Bormes, seeks judicial review of the Commissioner's

final decision denying him payment of supplemental security income (SSI)

benefits under Title XVI of the Social Security Act.[1] Mr. Bormes has filed a

complaint and has requested the court to reverse the Commissioner's final

---

[1]SSI benefits are sometimes called "Title XVI" benefits, and SSD/DIB benefits
are sometimes called "Title II benefits." Receipt of both forms of benefits is
dependent upon whether the claimant is disabled.  The definition of disability
is the same under both Titles.  The difference –greatly simplified--is that a
claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage"
status (calculated according to one's earning history), and the amount of
benefits are likewise calculated according to a formula using the claimant's
earning history.  There are no such "coverage" requirements for SSI benefits,
but the potential amount of SSI benefits is uniform and set by statute,
dependent upon the claimant's financial situation, and reduced by the
claimant's earnings, if any.  There are corresponding and usually identical
regulations for each type of benefit.  See e.g. 20 C.F.R. § 404.1520 and
§ 416.920 (evaluation of disability using the five-step procedure under Title II
and Title XVI).  In this case, Mr. Bormes filed his application for SSI benefits
only.  AR 184-92.

decision denying him disability benefits and to enter an order awarding benefits.  Alternatively, Mr. Bormes requests the court remand the matter to the Social Security Administration for further hearing.  The matter is fully briefed and is ready for decision.  For the reasons more fully explained below, the Commissioner's decision is reversed and remanded.

## JURISDICTION

This appeal of the Commissioner's final decision denying benefits is properly before the district court pursuant to 42 U.S.C. § 405(g).  This matter is before this magistrate judge pursuant to the consent of the parties.  See 28 U.S.C. § 636(c).

## STIPULATED FACTS[2]

Claimant Mark Bormes ("Claimant") is a male born April 12, 1961.  AR 184.  On November 25, 2013, Claimant protectively filed an application for supplemental security income ("SSI Claim"), alleging disability since October 1, 1996.  AR 184-192.  The Social Security Administration ("SSA") denied Claimant's SSI claim initially on March 7, 2014, and on reconsideration on October 22, 2014.  AR 114-116, 123-129.

On November 5, 2014, Claimant filed a written request for hearing.  AR 130-133.  On November 16, 2015, Claimant appeared and testified before

---

[2] The stipulated facts were agreed upon and submitted by the parties.  See Docket No. 13.  The paragraph numbers have been deleted and headings have been added by the court. Some grammatical and/or stylistic changes have been made.  Otherwise, the stipulated facts are recited in this opinion from the parties' joint submission.  Facts will be supplemented as deemed necessary by the court in the DISCUSSION section of this opinion.

Administrative Law Judge Denzel Busick (the "ALJ") at a hearing held in Sioux Falls, South Dakota.  AR 64-99.  James Miller, an impartial vocational expert ("VE"), also testified at the hearing.  AR 64.  On December 21, 2015, the ALJ issued an unfavorable decision.  AR 43-57.

On February 11, 2016, Claimant requested the Appeals Council to review the ALJ's decision.  AR 42.  On September 1, 2016, the Appeals Council denied Claimant's request for review.  AR 1-7.

The ALJ found that the Claimant has not engaged in substantial gainful activity since November 25, 2013, the date of the application at issue.  AR 48. (Decision 3).  The ALJ found that Claimant has the following severe impairments pursuant to 20 CFR 416.920; eczema[3] and hearing problems.  AR 48.  (Decision 3.)  At the hearing, Claimant testified he was not alleging disability due to poor hearing.  AR 80.  The ALJ determined that Claimant's medically determinable impairment of affective disorders and anxiety disorders were non-severe.  AR 48.  (Decision 3.)

In June 2014, Claimant's human immunodeficiency virus (HIV) test was positive and asymptomatic.  AR 345.  Charles Shafer, M.D., also assessed chronic hepatitis B virus.  AR 345.  (Ex. 5/F/9).

In his July 2014 Function Report, Claimant stated that he lived alone, prepared meals, fed and walked his dog, watched television, did laundry, mowed his small yard, and did light housework.  AR 251-253.  Claimant also

_____

[3] Eczema is defined as "an inflammatory condition of the skin characterized by redness, itching, and oozing vesicular lesions which become scaly, crusted or hardened."  "eczema."  Merriam-Webster Online Dictionary 2017. http://www.merriam-webster.com (17 March 2017).

said he drove, gardened, shopped in stores, and went to his brother's house for dinner once a week. AR 254-255. He said he had no problems shaving, feeding himself, caring for his hair, and using the toilet. AR 252.

At the hearing, Claimant testified that he was diagnosed with HIV in 1991. AR 71. He said that he continued to work for at least the next four years. AR 71. Claimant testified that he was diagnosed with full-blown AIDS in 2005. AR 71. Claimant testified that he was diagnosed with Hepatitis B in about 1995. AR 71-72.

Claimant testified that he takes the following prescription medications to treat his HIV condition: Epzicom and Triumeq. AR 74. Claimant testified that he takes the following prescription medications to treat his conditions of affective disorders and anxiety disorder: Klonopin, Abilify and Doxepin. AR 75.

Claimant testified that he has been continuously treated for HIV and hepatitis B since he was diagnosed with those diseases. AR 72. Claimant testified that he takes the following prescription medications to treat hepatitis B: Viry. AR 73.

The ALJ found the Claimant has the RFC to perform light work as defined by 20 CFR 416.967(b) as follows: can lift 20 pounds occasionally and less than 10 pounds frequently; can sit for a total of 6 hours, as well as stand and walk, combined, a total of 6 hours in an 8-hour day; no limits in reaching and handling; is able to perform all postural activities frequently; has no visual limits with proper glasses; has some difficulty hearing; and is unable to wear a

hearing aid, thus he must avoid environments with loud noise, large crowd noise, and loud background noise.  AR 49-50.  (Decision p. 4.)

Treatment notes dated December 2012, August 2013, February 2014, June 2014, and July 2015 indicated that Claimant's HIV testing was positive, but asymptomatic (AR. 289, 300, 345, 360, 396).  At an August 2013 HIV follow-up appointment, Claimant reported new skin lesions.  AR 286.  He said that his current skin lesions were always related to heat.  AR 286.  Claimant also said that he used Triamcinolone Acetonide Cream (TAC) and Hibiclens, which helped a bit.  AR 286.  Charles Shafer, M.D., thought that Claimant's skin issues involved "some component from psych/stress."  AR 289.

In November 2013, Claimant sought treatment for a left groin rash, which he attributed to recurrent fungal problems.  AR 285.  Claimant had no other concerns of fever, chills, headaches, nausea or vomiting.  AR 285.

At a December 2013 psychotherapy appointment, Claimant's speech, attitude, cognitive functioning and affect were normal.  AR 308.  His thought processes and thought content were not impaired.  AR 308.  He said he felt good physically and emotionally and was coping with stressors well.  AR 308.  At a follow-up psychiatry visit that same month, Claimant said the Thanksgiving holiday was a little stressful, but he had not had a major breakout of hives.  AR 307.  He said his medications were working fine.  AR 307.

When Claimant returned to psychotherapy in January 2014, his appearance, grooming, and attitude were normal.  AR 362.  He was also

cooperative with no behavior abnormalities. AR 362. Claimant reported he did not have a painful breakout of sores, but was frustrated because he was sick. AR 362-363. At a follow-up later that month, Claimant reported anxiety because his car window was broken. AR 361. He also said some family issues caused him to "break out." AR 361. During the session, Erin Sanford, M.A., worked with Claimant on better ways to manage his feelings and stress levels so as to help with the breakouts and associated pain. AR 361.

In a January 2, 2014, letter to Disability Determination Services, Vicki Harkness, Claimant's social worker, stated that he enjoyed gardening, watching television, walking his dog, and exploring antique stores. AR 330.

In March 2014, Claimant told Rajesh Singh, M.D., that he was doing fair and his mood was fairly stable. AR 353. He said that he used Xanax when he started to feel breakouts, which seemed to help. AR 353. Claimant also said Celexa seemed to be working well. AR 353. Dr. Singh noted Claimant was alert with coherent thoughts. AR 353. He did not make any medication changes. AR 353.

In August 2014, Claimant told Ms. Sanford that he still had some painful skin rashes and bumps, but for the most part, they were getting better. AR 422. Claimant said his health was great and he was doing better with his anxiety. AR 422.

Also in August 2014, Claimant followed up with Dr. Shafer. AR 423. Claimant reported that he had not been using his TAC ointment and creams on a regular basis, and never more than once per day. AR 423. He said his skin

felt better when he used the ointments/creams, but that it eventually peeled and seemed worse. AR 423. Claimant said his skin always got worse when he was emotionally stressed. AR 423. Dr. Shafer instructed Claimant to use the ointment when his rash was really bad, and then use the cream when it got better. AR 426.

In September 2014, Claimant attended a psychotherapy follow-up. AR 419. He said that his physical health "has been good," and he reported no major rashes or breakouts. AR 420. Claimant also said he was doing some things to improve his self-care such as gardening, accepting invitations to do things with his brother, etc. AR 420.

In December 2014, Claimant told Dr. Singh that his skin symptoms were worse when stressed. AR 470.

In February 2015, Claimant sought treatment for generalized anxiety disorder. AR 475. He reported that a rash on his left leg had gotten worse over the past week secondary to stress and anxiety pertaining to family and financial stressors. AR 475. Claimant also reported that aside from situational anxiety, his moods had been good with no depression or feelings of helplessness/hopelessness. AR 475. He also said his sleep had been better the past couple of days. AR 475. Claimant's symptoms were "well controlled" on current psychiatric medications, and he reported no side effects. AR 476.

In April 2015, Claimant saw Dr. Shafer for a re-check of multiple medical problems. AR 402. He reported a right lower leg rash, but said that he had stopped using his TAC cream and ointment because it caused burning. AR

402. Claimant reported no nausea, vomiting, abdominal pain, or diarrhea. AR 402. Dr. Shafer instructed Claimant to restart the TAC ointment for his right leg rash. AR 405. He also recommended that Claimant "get out and exercise." AR 405.

At a May 2015 psychiatry appointment, Claimant reported family and financial stressors, but said that he was still gardening and trying to get out and do things. AR 484. He believed his medications were adequately managing his symptoms with no reported side effects. AR 484. On examination, Claimant was well-groomed, appropriate, and cooperative. AR 486. His speech and thought processes were normal, his associations were intact, his judgment and insight were fair, and his mood, attention, and concentration were good. AR 486. Dr. Singh instructed Claimant to continue his current mediations. AR 486.

In July 2015, Claimant reported that his skin issues had worsened amount a month ago due to stress, but were currently improving. AR 377. He also said he experienced some diarrhea about 2 months ago but that is had cleared up on its own. AR 377.

In October 2015, Claimant told Dr. Shafer that his skin broke out due to stress after learning that he had to visit with a judge regarding his disability claim. AR 383. Claimant also reported right ear fullness and discomfort, but his recent labs were "really quite excellent." AR 383. He reported no nausea, vomiting, or diarrhea. AR 383. He said he experienced abdominal pain when

anxious, but that it resolved when the source of stress disappeared. AR 383. On examination, Claimant was alert and in no acute distress. AR 384.

In an April 2015, "To Whom It May Concern" letter, Dr. Shafer, one of Claimant's treating physicians, opined that Claimant struggled with a number of medical and mental health issues. AR 370. He concluded that Claimant was not able to work at that time due to the combination of his diagnoses and treatment. AR 370. (Ex 7F).

In December 2014, Dr. Singh, Claimant's psychiatrist, opined that Claimant was unable to work due to generalized anxiety disorder combined with his chronic medical conditions. AR 369. (Ex 6F).

In his December 21, 2015, decision, the ALJ determined that the Claimant had no past relevant work. AR 52. (Decision 7). At the November 16, 2015, hearing, Claimant testified that he has an associates degree in fashion merchandising and visual merchandising. AR 69. Claimant testified that his last full time work was with Bloomingdales department store, which ended in 1996. AR 70. Claimant testified that he earned about $3,500 in 2014, and would earn approximately $3,500 by the end of 2015. AR 70. Claimant testified that he lived alone and was able to care for himself "pretty good." AR 83. He also testified that his doctors had never advised him not to work. AR 84.

At the hearing, the ALJ asked the VE to consider a hypothetical individual with limitations that matched the ALJ's ultimate RFC finding. AR 49-50, 88-89. The VE testified that such a hypothetical individual could

perform light, unskilled jobs of an electronics worker, motel cleaner, and survey worker. AR 90. Accordingly, the ALJ found that Claimant was not disabled because there are jobs existing in significant numbers in the national economy that Claimant can perform. AR 52-53. (Decision 8).

Based on the testimony of the VE, the ALJ found that "considering age, education, work experience and RFC, the claimant is capable of making a successful adjustment to other work existing in significant numbers in the national economy." Accordingly, the ALJ determined that Claimant was not disabled between November 25, 2013, the date he protectively applied for SSI, and December 21, 2015, the date of the ALJ's decision. AR 53. (Decision 8).

Claimant testified that the side effects he experiences from taking Viry are severe fatigue and diarrhea. AR 73. Claimant testified that the diarrhea he experiences requires him to immediately need to use a bathroom and he experiences this type of diarrhea about once per week and the episode of diarrhea can last for four or five days. AR 73-74.

Claimant testified that he took Triumeq to treat his HIV and took a pill that combined Reyataz and Epzicom. AR 74. Claimant testified that for years he has suffered from severe fatigue cause by his HIV medications. AR 74-75. Claimant testified that the fatigue he experiences requires naps about 10:30-11:00 a.m. of one to three hours. AR 75.

Claimant testified that he takes Doxepin primarily to treat skin rashes. AR 76. He also said that it helped with his depression. AR 76. Claimant testified that the rash condition he experiences manifests itself as sores the

size of nickels or dimes. AR 76. Claimant testified that the sores he experiences develop primarily on his wrists, legs, ankles, feet and toes. AR 76-78. Claimant testified that his sores bleed and ooze bodily fluid. AR 76. Claimant described these sores as being nearly constant and having about a 10 day cycle. AR 77. Claimant testified that he takes triamcinolone to treat his sores. AR 77.

Claimant testified that he is about half deaf in each ear. AR 79. Claimant testified that he is unable to wear hearing aids. AR 80. Claimant testified that he takes Klonopin twice daily. AR 81. Claimant testified that taking Klonopin causes him to experience confusion. AR 81. He also testified that he described the confusion he experienced to his doctor. AR 82. His doctor did not suggest discontinuing the drug. AR 82. Instead, he instructed Claimant to take it twice a day, but adjust it down a couple of hours, which Claimant said seemed to help. AR 82. Claimant testified that he experiences drowsiness from Klonopin and Xanax. AR 82. Claimant testified that he would require a nap of about one hour in the morning and in the afternoon if he worked an 8-hour job. AR 85. Claimant testified that the Klonopin would cause him to feel "a step behind everything." AR 86.

Claimant testified that because of his hepatitis B, he must clean his socks or other things which came in contact with bodily fluids from his sores with bleach. AR 87. Claimant testified that sometimes the bodily fluid from his sores which gets in his socks cannot be cleaned with bleach so he must throw away the socks. AR 87.

The VE's opinion is that a person able to perform light level work requiring a 30 minute to one hour break during the first half of the day and another 30 minute to one hour break in the afternoon would not be able to maintain competitive full-time employment. AR 91. The VE's opinion is that an unskilled person with moderate limitations on his ability to perform because of the side effects of Doxepin which Claimant described would not be capable of competitive employment. AR 92-94. The VE's opinion is that employers would not be willing to "deal" with an employee with HIV and hepatitis B who experiences an outbreak of sores as Claimant described his condition. AR 95.

## DISCUSSION

### A.    Standard of Review.

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009). Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975). "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action." Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (internal punctuation altered, citations omitted).

12

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. <u>Minor</u>, 574 F.3d at 627. The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision. <u>Reed v. Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005); <u>Woolf v. Shalala</u> 3 F.3d 1210, 1213 (8th Cir. 1993). If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. <u>Oberst v. Shalala</u>, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." <u>Mittlestedt v. Apfel</u>, 204 F.3d 847, 851 (8th Cir. 2000)(citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. <u>Smith v. Sullivan</u>, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. <u>Walker v. Apfel</u>, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. <u>Smith</u>, 982 F.2d at 311.

**B.    The Disability Determination and the Five-Step Procedure.**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSI and SSD/DIB applications. Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520. When a determination that an applicant is or is not disabled can be made at any step, evaluation under a subsequent step is unnecessary. Bartlett v. Heckler, 777 F.2d 1318, 1319 (8th Cir. 1985). The five steps are as follows:

**Step One:** Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

**Step Two:** Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three:** Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1,

Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. Bartlett 777 F.2d at 1320, n.2. This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. Heckler v. Campbell, 461 U.S. 458, 460, (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four. NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

**Step Four:** Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five:** Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 1520(f).

## C.    Burden of Proof.

The plaintiff bears the burden of proof at steps one through four of the

five-step inquiry. Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994);

Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a). The burden of proof

shifts to the Commissioner at step five. "This shifting of the burden of proof to

the Commissioner is neither statutory nor regulatory, but instead, originates

from judicial practices." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999).

The burden shifting at step five has also been referred to as "not statutory,

but . . . a long standing judicial gloss on the Social Security Act." Walker v.

Bowen, 834 F.2d 635, 640 (7th Cir. 1987). Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." Stormo v. Barnhart 377 F.3d 801, 806 (8th Cir. 2004).

**D.     The ALJ Erred in Discrediting Mr. Bormes' Testimony**

      **1.     Polaski and Its Progeny**

The sole issue raised in this appeal by Mr. Bormes is whether the ALJ erred in discrediting Mr. Bormes' testimony. This analysis must begin with the principle that the court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005). "When an ALJ reviews a claimant's subjective allegations . . . and determines whether the claimant and his testimony are credible, the ALJ must examine the factors listed in Polaski and apply those factors to the individual." Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996).

In determining whether to fully credit a claimant's subjective complaints, an ALJ must consider several factors, including: whether such complaints are supported by objective medical findings, whether the claimant has refused to follow a recommended course of treatment, whether the claimant has received minimal medical treatment, whether the claimant takes only occasional medications, the claimant's prior work record, observation of third parties and examining physicians relating to the claimant's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating

factors; dosage, effectiveness, and side effects of medication; and functional restrictions.  Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).  A claimant's subjective complaints may be discredited only if they are inconsistent with the evidence as a whole.  Id.

With regard to the factor of a claimant's daily activities, the ALJ must consider the "quality of the daily activities and the ability to sustain activities, interest, and relate to others *over a period of time* and the frequency, appropriateness, and independence of the activities."  Wagner, 499 F.3d at 852 (citing Leckenby v. Astrue, 487 F.3d 626, 634 (8th Cir. 2007)) (emphasis in original).  Although activities which are inconsistent with a claimant's testimony of a disabling condition reflect negatively on the claimant's credibility, the ability to do light housework and occasional visiting with friends does not support a finding that the claimant can do full-time work in the "competitive and stressful conditions in which real people work in the real world."  Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir. 2005) (quoting Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989)).

In the Wagner case, the ALJ's discrediting of the claimant's subjective complaints of pain was affirmed on appeal where Wagner had engaged in extensive daily activities, as evidenced by his "Daily Activities Questionnaire" and his testimony at the hearing, and where his testimony as to the limiting effect of his pain was inconsistent with the medical record because his records reflected that he did not pursue ongoing evaluation or treatment for his pain

17

and he did not seek or take pain medication on a regular basis. <u>Wagner</u>, 499 F.3d at 852-853. <u>See also</u> <u>Baker v. Barnhart</u>, 457 F.3d 882, 892-894 (8th Cir. 2006) (affirming ALJ's discrediting of claimant's subjective complaints of pain where claimant engaged in a significant amount of activities of daily living–full self-care, driving a car, shopping, and running errands–a medical source opined that the claimant engaged in symptom exaggeration, the claimant did not take pain medication, and the absence of an etiology for the alleged pain).

In <u>Bentley v. Shalala</u>, 52 F3d 784, 785-786 (8th Cir. 1995), the ALJ's discrediting of the claimant's subjective complaints of pain was affirmed on appeal where the claimant had not sought medical treatment for his pain for a long period of time and was not taking any prescription medication for pain. In addition, the record reflected that the claimant had applied for a number of jobs during his claimed disability period. <u>Id.</u>

In <u>Harvey</u>, an ALJ who discredited the claimant's testimony as to limitations on his activities was affirmed where the evidence showed the claimant had made prior inconsistent statements to his physicians regarding his limitations and his asserted need to use crutches or a non-prescribed walker was inconsistent with statements made by the claimant on other occasions. <u>Harvey v. Barnhart</u>, 368 F.3d 1013, 1015-1016 (8th Cir. 2004).

In <u>Guilliams</u>, 393 F.3d at 802-803, the Eighth Circuit affirmed an ALJ's discrediting of the claimant's subjective complaints of back pain where claimant used a cane, but no medical prescription for the cane existed; where several medical exams revealed the claimant to be in no significant distress;

where MRIs of the spine revealed essentially normal findings; where the claimant's muscle mass was not atrophied despite his allegation of restriction of motion and diminishment of strength; where the claimant declined to follow medical advice regarding treatment of his pain; and where medical evidence demonstrated that pain medication alleviated the claimant's symptoms of pain.

In <u>Dolph v. Barnhart</u>, 308 F.3d 876, 879-880 (8th Cir. 2002), the ALJ's discrediting of the claimant's subjective complaints of pain from kidney disease and degenerative spine disease was affirmed where the claimant's records of her kidney disease showed "consistently stable renal function" and there was no record support for "complaints of ongoing, severe, protracted discomfort."

It is the above body of law this court applies to the review of the record in this case.

## 2. Evidence Before the ALJ

Although the key question before the ALJ is whether the evidence showed Mr. Bormes to be disabled during the period from his disability application (November 25, 2013), until the date of the hearing (November 16, 2015), nevertheless the ALJ is required to review all of the relevant medical evidence. The ALJ acknowledged this rule when reciting that he did not limit his review of medical records to only that time period between the application and the hearing. This court, then, also takes a longitudinal view of the medical evidence.

### a. Medical Records

The oldest medical record consists of a letter from Physician's Assistant Heather Hennigan Wadley dated October 29, 2010. AR 212. In this letter, Ms. Wadley states Mr. Bormes suffers from a "debilitating rash" of unknown cause which has lasted for 18 months—since March, 2009. Id. Ms. Wadley opines that the rash rendered Mr. Bormes incapable of employment. Id.

Mr. Bormes moved to Sioux Falls in approximately 2011. The medical records from Mr. Bormes' Sioux Falls medical providers begin on November 22, 2013, and extend until March, 2016.[4] Those records reflect that Mr. Bormes consistently saw Dr. Rajesh Singh for psychiatry treatment, Dr. Charles Shafer for infectious disease treatment, and Erin Weber/Sanford for counseling.

Nearly every one of these documents records Mr. Bormes' ongoing problem with his rash, which never disappeared at any time during this two-and-a-half year period. See AR 36, 38, 63-64, 286, 290, 292, 328-31, 383-85, 393-97, 402-06, 411-15, 423-26, 438-40, 441-42, 444, 445-46, 447, 470, 475, 493-94, 497-98. Although the rash was sometimes described as eczema (AR 423-26), the doctors also described it numerous times as prurigo nodularis, stasis dermatitis, and hyperkeratosis. AR 36, 328-31, 393-97, 403, 405, 411-15, 438-40. The medical records explain prurigo nodularis is a condition with painful eruptions of skin that itch and ooze. AR 328-31.

---

[4] Although pre-November, 2013, medical records from Dr. Singh and Dr. Shafer are not in the administrative record, Mr. Bormes testified he began seeing these doctors immediately upon his relocation to Sioux Falls. AR 72-73.

Regardless of the label one puts on the condition, the physical description of these rashes and sores is dramatic. In November, 2013, he was described as having "multiple scaly lesions." AR 446. In January, 2014, medical records describe leg sores that had existed since the preceding summer and would not go away. AR 441-42. In February, 2014, records described Mr. Bormes' lesions as "multiple excoriations, some as big as 2.5 centimeters in diameter on his lower legs with smaller lesions on his arms." AR 438-40. In August, 2014, medical records document that his sores were worse, with two palm-sized areas on Mr. Bormes' right calf, dark purple and red with cracking. AR 423-26. Mr. Bormes' left calf had a similar area of five centimeters in diameter. Id. In July, 2015, Dr. Shafer described Mr. Bormes as having "bleeders" all over his body. AR 393-97. In September, 2015, Mr. Bormes' skin was described in medical records as "splitting." AR 494. His skin condition was repeatedly described as "chronic" and "excoriated" (i.e. the upper layer of skin is gone) with open areas. See, e.g. AR 36, 394, 403, 411-15.

Nor were the sores confined to his arms and legs. Beginning in April, 2015, Mr. Bormes' rash spread to his hands, fingers, and fingertips, causing splitting, oozing skin. AR 402-06. Six months later, in October, 2015, medical records document the skin on Mr. Bormes' fingers was tearing and easily split. AR 383-85. A year after Mr. Bormes' rash had spread to his hands, it was still uncontrolled. In March, 2016, medical records documented thickened, cracking skin on his hands. AR 36. Mr. Bormes was forced to wear gloves

when working with his hands.  Id.  The lesions had spread from his palm, to his fingers, and to his fingertips.  Id.  Dr. Shafer stated the obvious in a February, 2016, medical record when he noted that Mr. Bormes' hands had not gotten better.  AR 38.  At this same time, Mr. Bormes' medical records document a six-by-three centimeter lesion on his right calf that was excoriated. AR 36.

No medical record documents a specific cause for Mr. Bormes' rash. There is some indication it is caused by the AIDS medications he is required to take or AIDS itself.  There also seems to be some correlation between Mr. Bormes' anxiety and his rash.  The medical records document that Mr. Bormes has continually sought care for his anxiety, has continually been prescribed medication for his anxiety, has faithfully taken his prescribed anxiety medication, and yet the anxiety is not controlled well by medication. AR 369, 470, 493-94, 497-98.  He has made regular appointments with Dr. Singh and Ms. Weber/Sanford for mental health treatment, he has kept those appointments, and he has taken all medication prescribed for his mental health.

Mr. Bormes' medical records also document a long-standing problem with fatigue or exhaustion as a result of his medications, causing him to sleep excessively and feel like he was "in a daze."  AR 328-31, 438-40.  The records document that he was taking a two-hour nap in the afternoon every day and that this practice had occurred for over 12 years.  AR 328-31, 438-40.

### b.    Testimony From the Hearing

Mr. Bormes testified at the hearing before the ALJ.  AR 71-87.  He testified he was first diagnosed with HIV in 1991.  AR 71.  He was diagnosed with hepatitis B in 1995.  Id.  He developed full-blown AIDS in 2005.  Id.  He was diagnosed with post-traumatic stress disorder and anxiety disorder while he was living in Oklahoma prior to 2011.  AR 72.  He moved to Sioux Falls, South Dakota, in 2011.  Id.

Once he arrived here, he began seeing Dr. Rajesh Singh, a psychiatrist, and Dr. Charles Shafer, an infectious disease specialist.  Id.  He takes numerous medications for his conditions.  He takes Viry for hepatitis B.  AR 73-74.  This medication causes severe fatigue as a side effect as well as giving him diarrhea three to four times per month.  Id.  The diarrhea, when it occurs, can last up to four or five days.  Id.

Mr. Bormes testified he takes Epzicom and Triumeq for his AIDS.  AR 74.  This medication also causes severe fatigue as well as skin rashes.  Id.  Mr. Bormes testified the fatigue caused by his medicines causes him to take a one- to three-hour nap every day.  AR 75.  Some days Mr. Bormes testified he needs two naps.  AR 83.  This has been an ongoing problem for about 25 years, or since about 1991 when he was first diagnosed with HIV.  AR 75.

For his anxiety, Mr. Bormes takes Klonopin, Abilify and Doxepin.  Id.  The Klonopin makes him confused sometimes resulting in him getting mixed up while driving.  AR 81.  The effect of Klonopin on his cognition is that he feels "slow as a turtle" or "a step behind" both mentally and physically.  AR 86.

Mr. Bormes described his skin condition as consisting of nickel- to dime-sized sores, mostly on his feet and wrists, but also on his legs, armpits or anywhere on his body. AR 76, 78. These sores bleed and ooze bodily fluid a lot. AR 76. His skin condition never goes away. AR 77. He uses Trisimilone cream for his skin condition, but it never clears it up. Id. Fluid from his sores transfers to his socks or whatever the sores come into contact with. AR 78. Mr. Bormes testified he usually has to wash his socks in bleach or even throw them away because of the oozing of his sores. AR 87.

A vocational expert (VE), James Miller, testified no employment was available for someone who needed a 15-minute nap in the morning and another 15-minute nap in the afternoon. AR 91. The VE also testified that the combination of Mr. Bormes' infectious diseases (AIDS and Hepatitis B) along with his sores that break open and ooze blood would eliminate most employment. AR 94-95. Although he stated there might be some jobs where potential contamination might not be an issue, the VE testified "I can't imagine employers dealing with that." AR 95. The VE also testified if someone suffered from mental confusion such that they were "off task" more than 5-10 percent of the time, they would not be able to hold any type of competitive employment. AR 93-94.

However, if the sores, naps, and confusion were not considered, and if one assumed Mr. Bormes had the ability to perform work at the light duty designation, then Mr. Bormes could do the jobs of electronics worker, a motel

cleaner, and a survey worker.  AR 89-90.  No work would be available for

Mr. Bormes at a sedentary level.  AR 90.

### 3.    The ALJ's Decision

The ALJ characterized Mr. Bormes' severe impairments to be "eczema"

and a hearing impairment.  AR 48.  The ALJ characterized Mr. Bormes'

nonsevere impairments to be affective disorder and anxiety disorder.  <u>Id.</u>  The

ALJ did not even mention Mr. Bormes' HIV, AIDS, or Hepatitis B (<u>id</u>.), even

though Mr. Bormes alleged he was disabled due to HIV, medication-induced

fatigue, anxiety and skin lesions (AR 218) and a Disability Determination had

previously found Mr. Bormes suffered from these medically determinable

impairments (AR 107).

The ALJ found that Mr. Bormes' skin condition, hearing impairment and

mental condictions did not impair his activities of daily living at all.  AR 48.

The ALJ found these conditions mildly impaired Mr. Bormes' social functioning

and his concentration, persistence and pace.  <u>Id.</u>  The ALJ found no episodes of

decompensation, which the ALJ defined as temporary increases in Mr. Bormes'

symptoms or signs that impair one of the above three categories (activities of

daily living; social functioning; and concentration, pace, and persistence).  <u>Id.</u>

In analyzing step 3 of the sequential analysis, the ALJ considered

whether Mr. Bormes' skin condition met or exceeded listing 8.05.  AR 49.  In

considering this listing, the ALJ held that the evidence did *not* demonstrate

extensive lesions with involvement of the *hands* or feet imposing a marked limitation of function and *no response to treatment*.[5] Id. (emphasis added).

Although Dr. Rajesh Singh, Mr. Bormes' longtime treating psychiatrist, opined that Mr. Bormes was incapable of working (AR 369), the ALJ rejected that opinion both because it was an opinion on the ultimate question of disability which was reserved to the ALJ and because Dr. Singh's opinion was "inconsistent with medical evidence of record." AR 52. Similarly, the ALJ rejected the disability opinion of Dr. Charles Shafer (AR 370), Mr. Bormes' longtime infectious disease physician, on the same grounds. Id. Instead, relying on state physicians' opinions who merely reviewed Mr. Bormes' records and never examined or treated him, the ALJ found Mr. Bormes' impairments did not prevent his employment. AR 49-52.

The ALJ determined there was no past relevant work Mr. Bormes could perform. AR 52. Therefore, the ALJ addressed whether there was other work available in significant numbers in the national economy that Mr. Bormes could do. Id.

The ALJ determined Mr. Bormes had the residual functional capacity (RFC) to perform light work. AR 49-50. This consisted of being able to lift and carry 20 pounds occasionally, lift and carry 10 pounds frequently, sit for six

---

[5] Although no party claims error in the ALJ's analysis at step three, this court notes the ALJ's conclusion that Mr. Bormes' rash did not involve his hands was in error, as was his conclusion that the rash was responsive to treatment. The medical records clearly show the rash spread to Mr. Bormes' hands and that his rash was ongoing for over six years, despite constant treatment. AR 36, 38, 212, 286, 290, 292, 328-31, 383-85, 393-97, 402-06, 411-15, 423-26, 438-40, 441-42, 444-46. This seems to this court to be the very definition of being unresponsive to treatment.

hours, stand and walk a combined six hours, with no limits on reaching and handling.  AR 50.  The light duty designation also encompassed the ALJ's conclusion Mr. Bormes could perform all postural activities frequently and had no visual limitations so long as he wore proper glasses.  Id.  The ALJ conceded Mr. Bormes had some difficulty hearing and was unable to wear a hearing aid because of frequent rashes and sores in his ears, so the ALJ concluded he would have to avoid environments with loud noise.  Id.

The ALJ conceded that Mr. Bormes impairments could cause the symptoms of difficulty in remembering, completing tasks, concentrating, understanding, following instructions, getting along with others, dressing and bathing, and being unable to handle financial matters.  AR 50-51.  However, the ALJ held Mr. Bormes' testimony concerning the intensity, persistence and limiting effects of the symptoms were not credible.  AR 51.  The ALJ relied on the fact that Mr. Bormes could take medicine, cook meals, mow the lawn, drive a car, shop, watch television, care for a dog, garden, and go to weekly dinners at his brother's house.  Id.  The ALJ concluded these activities were inconsistent with Mr. Bormes' testimony about the effects of his impairments.  Id.  The ALJ then cited to select excerpts from the medical records and the state agency physicians to support his conclusion.  Id.

     **4.**    **Analysis of the ALJ's Decision Under <u>Polaski</u>**

        **a.**    **The <u>Polaski</u> Factors Favor Crediting Mr. Bormes'**
            **Testimony**

Mr. Bormes contends the ALJ improperly discredited his testimony regarding his need for naps and his skin condition.  The appropriate factors to

be considered when evaluating whether a claimant's subjective complaints are consistent with the evidence as a whole are: (1) the objective medical evidence; (2) the claimant's daily activities; (3) the duration, frequency and intensity of pain; (3) dosage and effectiveness of medication; (4) precipitating and aggravating factors; (5) functional restrictions; (6) the claimant's prior work history; (7) observations by third parties; (8) diagnosis by treating and examining physicians; and (9) claimant's complaints to treating physicians. See Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001); Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993).  See also Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 404.1529(c)(3) (the Polaski factors in regulation form).

The ALJ is not required to "explicitly discuss *each* Polaski factor in a methodical fashion" but rather it is sufficient if he "acknowledge[s] and consider[s] those factors before discounting [the claimant's] subjective complaints of pain." Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996) (emphasis added).

The ALJ erred in applying Polaski to Mr. Bormes' testimony. Virtually all of the Polaski factors favor crediting, not discrediting, Mr. Bormes' testimony. There is a plethora of objective medical evidence in the record documenting Mr. Bormes' skin condition, its chronic nature, and its severity.  That information is discussed in detail above.  For the ALJ to suggest that Mr. Bormes' skin condition was better, or "normal" as the ALJ did in in middle

paragraph of AR 51 is simply to not take into account the extensive medical record documenting Mr. Bormes' objectively-verifiable and severe lesions.

Also, Mr. Bormes never refused to follow a recommended course of treatment. The medical records are replete with references to his extreme conscientiousness in taking all prescribed medications.

The medical records do not reveal "minimal medical treatment." Instead, they reveal that Mr. Bormes was seen by one of his three medical care providers (Dr. Singh, Dr. Shafer or Ms. Sanford/Weber), every couple of weeks for a four-year period of time.

Another factor the ALJ should have considered is whether Mr. Bormes took only occasional medications. Again, this factor supports, rather than detracts from, Mr. Bormes' testimony. He took numerous medications every day, some of them twice a day.

The duration, frequency and intensity of Mr. Bormes' symptoms was also well-documented in the medical records and supported his testimony. Mr. Bormes' anxiety, AIDS, hepatitis B, and skin condition, and the numerous medications he was required to take to address those impairments, together with the severe side effects of some of those medications and conditions, were never absent from his life. They are documented in every one of Dr. Singh and Dr. Shafer's visits.

The precipitating and aggravating factors for Mr. Bormes' skin condition were his AIDS and his anxiety. His doctors tried differing medications, but none resulted in the skin condition being alleviated. Likewise, differing anti-

anxiety medications were tried, but none resulted in vanquishing Mr. Bormes' anxiety.

Finally, the dosage, effectiveness, and side effects of Mr. Bormes' medications were not discussed by the ALJ. These, too, favor crediting rather than discrediting Mr. Bormes' testimony.

### b. Medical Records Do Not Support Discrediting Mr. Bormes' Testimony

The ALJ's decision discrediting Mr. Bormes' testimony rested on two prongs: (1) certain isolated medical records from Erin Weber/Sanford and others; and (2) Mr. Bormes' activities of daily living. Neither of these suffice under <u>Polaski</u>.

As for Ms. Weber/Sanford, she is not an "accepted medical source" according to the Commissioner's regulations. <u>See</u> 20 C.F.R. §§ 416.902(a), 416.927. In general, an ALJ may consider evidence from a source who is not an "accepted medical source" like Ms. Weber/Sanford, but such evidence must be weighed according to the following factors and compared to the evidence from treating physicians and state agency physicans who *are* accepted medical sources:

–whether the opinion is consistent with other evidence in the record;

--whether the opinion is internally consistent;

–whether the person giving the medical opinion examined the claimant;

–whether the person giving the medical opinion treated the claimant;

–the length of the treating relationship;

–the frequency of examinations performed;

–whether the opinion is supported by relevant evidence,
especially medical signs and laboratory findings;

–the degree to which a nonexamining or nontreating
physician provides supporting explanations for their
opinions and the degree to which these opinions
consider all the pertinent evidence about the claim;

--whether the opinion is rendered by a specialist about
medical issues related to his or her area of specialty;
and

–whether any other factors exist to support or contradict the
opinion.

See 20 C.F.R. § 416.927(a)-(f); Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007).

"A treating physician's opinion is given controlling weight 'if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.' " House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007) (quoting Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005)); 20 C.F.R. § 416.927(d)(2). "A treating physician's opinion 'do[es] not automatically control, since the record must be evaluated as a whole.' " Reed, 399 F.3d at 920 (quoting Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995)).

Here, unlike Dr. Singh and Dr. Shafer, Ms. Weber/Sanford does not qualify as an "accepted medical source." But more importantly, an examination of her records reveal that they are almost entirely duplicates of each other. The text of each entry every couple of weeks is simply duplicated

over and over and over again.  The inescapable conclusion when one examines

these records is that they do not represent a true record of

Ms. Weber/Sanford's observations and impressions from each counseling

session with Mr. Bormes.  For example, Ms. Weber/Sanford's entry for her

counseling session with Mr. Bormes on December 13, 2013, reads as follows:

**Subjective**
Encounter Site:  Falls Community Health.
This therapist met with client in the therapy office for a follow
psychotherapy session to address symptoms of anxiety and
depression, to talk about difficulties from the week, and to discuss
ways to improve patient's quality of life.  Client arrived for session
on time.  She [sic] discussed the highs and lows from the previous
week.  We reviewed her [sic] progress since our last session and
continued to work on her [sic] personal goals.

**Objective**
The level of consciousness was normal, cognitive functioning was
normal, and no perceptual disturbances were noted.  The speech
was normal, no abnormality of coordination/cerebellum was noted,
and gait and stance were normal.  No multiple distinct and
complex personalities were observed, the appearance was normal,
and the grooming was normal.  The behavior demonstrated no
abnormalities, the attitude was normal, and was cooperative.  The
mood was euthymic, the affect was normal, thought processes
were not impaired, and the thought content revealed no
impairment.

Worked on the patients [sic] care plan and his personal goals to
work on at home.  We discussed his needs and continued to
address his emotional health and how it affects his physical
health.  We processed and discussed the stressors in his life and
how to work on decreasing unnecessary areas of frustration.  The
patient and therapist addressed the following things in session
today:  reducing worry, appropriate expression of feelings, and
stress reduction through personal inventory and using coping
skills . . .

**Plan**
Care Plan(s) Given:  Mental Health Care Plan and Self-Management
Tool(s) Given:  Mental Health Care Plan.  Plan to meet client for
follow up visit in 2 weeks.  We will continue to address the

patient's identified problem areas and goals.  We will continue to
work on lifting the mood and increasing positive attitude.  We will
work to stabilize the patient's mood and replace destructive
behaviors with healthy tools of self-care and expression.  We will
continue to work on decreasing symptoms of anxiety and
depression and develop helpful coping skills and strategies.  We
will also address any problems or concerns that come up in the
following weeks.

See AR 444-45.

Ms. Weber/Sanford's entry for January 2, 2014, was nearly identical.
The "subjective" portion of the record was identical.  See AR 442.  The
"objective" portion was nearly identical, beginning with "The appearance was
normal and the grooming was normal.  The behavior demonstrated no
abnormalities, the attitude was normal, and was cooperative.  The mood was
frustrated, was depressed, showed pain, was anxious, and the affect was
incongruent with the mood."  AR 442.  The remainder of this record under
"objective" beginning with "Worked on patients care plan . . ." and continuing
through ". . . decreasing unnecessary areas of frustration" is identical.  AR 443.
The "plan" section of the record is identical to the December 13 entry, with the
addition of one sentence:  "The patient left the clinic in stable condition."  Id.

All of Ms. Weber/Sanford's records pertaining to Mr. Bormes are
substantially identical.  They all report his appearance as "normal" and "well
groomed," his arrival "on time."  They all report the identical "subjective"
description, a nearly-identical "objective" description, and identical in all
material respects in the "plan" section.  See AR 308-10, 312-17, 319-20, 322-
26, 385-87, 389-93, 397-402, 406-11, 415-23, 426-35, 436-38, 441-42.  The
only part of Ms. Weber/Sanford's records that are differentiated are a few

sentences each visit describing what Mr. Bormes talked about: Christmas, the death of his dog, a visit to his mother's.

These records do not record how Mr. Bormes' rash was doing, how his AIDS or hepatitis were doing, how his medications were working, or what the side effects of his medications were. And for good reason—Ms. Weber/Sanford was not Mr. Bormes' treating physician for any of these issues. Therefore, although the records are plentiful, they are not particularly helpful in determining if the medical evidence supports a finding of disability. Aside from the fact that the records are very nearly reprints of one another, they do not address the issues that are at the heart of Mr. Bormes' disability claim.

One record from Ms. Weber/Sanford does address Mr. Bormes' medical conditions. AR 328-31. This was a functional assessment conducted by Ms. Weber/Sanford. Id. Although the ALJ cites to this record, he cherry-picks facts that support his conclusion and ignores the rest. Although the ALJ notes that Ms. Weber/Sanford describes Mr. Bormes' sores and the fact that he needs to put ointment on those sores, he completely fails to recite that the sores have been ongoing for 12 years, that they bleed and ooze, and that they are resistant to treatment. Compare AR 51 with AR 328-31. Although Ms. Weber/Sanford states that these sores are associated with Mr. Bormes' AIDS, as noted above, the ALJ does not even mention in his opinion that Mr. Bormes has AIDS or hepatitis. Compare AR 51 with AR 328-31. Likewise, the ALJ ignores Ms. Weber/Sanford's statement that Mr. Bormes' AIDS and

associated medications make him extremely fatigued and he needs naps every day.  Compare AR 51 with AR 328-31.

As described in greater detail above, the medical records from Dr. Singh and Dr. Shafer *do* address the core issues related to Mr. Bormes' disability claim.  The records of these accepted medical sources describe in great detail Mr. Bormes' AIDS, hepatitis, skin lesions, medications, and side effects of those medications.

The ALJ cites to one of Dr. Singh's records dated March 20, 2014, in which Mr. Bormes self-reported that the Xanax Dr. Singh prescribed "seems to help" with his rash.  See AR 51 (citing to AR 353).  This clearly leaves the reader of the ALJ's opinion with the impression the Xanax was a cure for the rashes.  However, a review of the whole of the medical evidence in the record shows that the rashes continued long after Mr. Bormes started taking Xanax.

Just three months later, in June, 2014, Dr. Singh documented that Mr. Bormes' skin breakouts were worse, despite using Xanax twice daily. AR 463-64.  Two months later, Dr. Shafer documented a worsening of Mr. Bormes' skin condition and described two palm-sized lesions on one of Mr. Bormes' legs and a 5 centimeter lesion on the other.  AR 423-26.  Four months later, Mr. Bormes still had "several" excoriated areas of open skin. AR 411-15.  Two months later, his leg rash was described as "worse."  AR 475. And two months after that, one year after the Dr. Singh record cited by the ALJ, Mr. Bormes' skin condition was described as "pretty bad" with the rash now having spread to Mr. Bormes' hands.  AR 402-06.  Four months later, the

medical evidence shows Mr. Bormes had "bleeders" all over his body with multiple excoriations of two to three centimeters in various places.  AR 393-97.  Two months after that, his skin was described as splitting.  AR 491, 493-94.  A month later two separate medical records describe the persistence of the rash on Mr. Bormes' hands.  AR 383-85, 497-98.

The ALJ also cites a July, 2015, pharmacy consultation note from an examiner who was not one of Mr. Bormes' treating physicians.  <u>See</u> AR 51 (citing AR 377).  The ALJ cites the record to indicate that Mr. Bormes reported his skin issues became worse, but were getting better.  <u>Id.</u>  The ALJ then cites to one of Ms. Weber/Sanford's duplicitous records from September, 2015, that Mr. Bormes had a normal appearance and grooming.  <u>See</u> AR 51 (citing AR 386).  Again, the impression the ALJ seems to be trying to convey is that Mr. Bormes' skin condition eventually cleared up.  However, as the above recitation of medical evidence shows, that was far from the case.

For the ALJ to cherry-pick medical records and recite them in a misleading fashion all the while ignoring the great bulk of the relevant medical evidence in discrediting Mr. Bormes' testimony was error.  <u>See</u> <u>Ghanim v. Colvin</u>, 763 F.3d 1154, 1164, 1166 (9th Cir. 2014) (holding it was error to cherry-pick characterizations from medical records to support discrediting claimant's testimony while ignoring other pertinent medical evidence).  It was also error to seize on Ms. Weber/Sanford's descriptions of Mr. Bormes' appearance as "normal" or "well groomed" to undermine his credibility.  <u>See</u> <u>Goble v. Astrue</u>, 385 Fed. Appx. 588, 591 (7th Cir. July 14, 2010) (holding to

be "patently wrong" the ALJ's adverse credibility determination based on medical records describing the claimant as "pleasant, alert and cooperative" where the medical evidence showed the claimant had undergone lengthy treatment including taking heavy doses of strong drugs to try to alleviate her symptoms). See also Minor v. Commissioner of Social Sec., 513 Fed. Appx. 417, 434 (6th Cir. Jan. 24, 2013) (adverse credibility determination by ALJ will not be upheld on appeal where it is not consistent with the entire record and the weight of relevant evidence).

### c.   Mr. Bormes' Daily Activities Do Not Discredit His Testimony

Nor do Mr. Bormes' activities of daily living discredit his testimony as to the nature and severity of his symptoms.  With regard to the factor of a claimant's daily activities, the ALJ must consider the "quality of the daily activities and the ability to sustain activities, interest, and relate to others *over a period of time* and the frequency, appropriateness, and independence of the activities." Wagner, 499 F.3d at 852 (citing Leckenby v. Astrue, 487 F.3d 626, 634 (8th Cir. 2007)) (emphasis in original).  Although activities which are inconsistent with a claimant's testimony of a disabling condition reflect negatively on the claimant's credibility, the ability to do light housework and occasional visiting with friends does not support a finding that the claimant can do full-time work in the "competitive and stressful conditions in which real people work in the real world."  Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir. 2005) (quoting Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989)).

Here, there is nothing about Mr. Bormes' activities of daily living that is inconsistent with his testimony. He testified his infectious diseases and the medications he takes make him extremely fatigued and confused such that he has to have a nap every day, sometimes twice a day. The VE testified there were no jobs available that would allow an employee to take such naps. Mr. Bormes testified he was confused and in a fog to the extent he was not able to handle his own financial affairs. The VE testified that there were no jobs available for someone who was "off task" five to ten percent of the time. Finally, the medical records are replete with evidence of oozing, bleeding sores that have resisted cures. The VE testified there were no jobs available for an employee with an infectious disease such as AIDS and hepatitis who also had bodily fluids seeping from sores in his body. Just because Mr. Bormes can spend an hour or two here and there shopping for antiques, caring for his dog, maintaining his house and his personal hygiene does not discredit the conditions he asserts to be disabling.

The ALJ cannot simply assert the claimant has "been exercising" or "doing housework" and hold that this is inconsistent with the claimant's impairments. Brown v. Commissioner Social Sec. Admin., ___ F.3d ___ 2017 WL 4320263 at *15 (4th Cir. Sept. 17, 2017). Instead, the ALJ must build an "accurate and logical bridge" from the evidence to his conclusion that the claimant is not believable. Id. Here, that bridge is lacking. The ALJ never discusses how Mr. Bormes' activities of daily living are inconsistent with his

testimony that he needs daily naps and has chronic oozing, bleeding sores on his body along with infectious diseases.

Here, the ALJ failed to discuss Mr. Bormes' AIDS or hepatitis or the symptoms caused by those diseases, failed to discuss the side effects of his medications, and failed to discuss the medical evidence from Dr. Singh and Dr. Shafer. The ALJ's conclusory statement that Mr. Bormes' testimony was inconsistent with the medical evidence as a whole rings hollow when the ALJ himself failed to acknowledge the great bulk of the medical evidence. Likewise the ALJ's statement that Mr. Bormes' daily activities are inconsistent with his testimony is insufficient without an explanation of how the two are inconsistent. The court cannot affirm on this record. The court cannot defer to the Commissioner's credibility determination because it is not supported by substantial evidence. Mr. Bormes' credibility should be determined anew upon remand.

**E.    Type of Remand**

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record. Mr. Bormes requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider her case.

42 U.S.C. § 405(g) governs judicial review of final decisions made by the Commissioner of the Social Security Administration. It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands. A

sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling. Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000). A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings. *Id.* Neither sentence six situation applies here.

A sentence four remand is applicable in this case. Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding." Buckner, 213 F.3d at 1011. In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings. Id., Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated. See also Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues

have been resolved and the record supports a finding of disability). Therefore, a remand for further administrative proceedings is appropriate.

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, this court hereby

ORDERS that the Commissioner's decision is REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.

DATED October 18, 2017.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge